PHŒNIX a. THE COMMISSIONERS OF EMIGRATION.

*New York Superior Court ; Special Term, May,* 1855.

INJUNCTION.—RESTRAINT OF NUISANCE.

Where a deed contained a covenant on the part of the grantor, a municipal corpo-
ration, that certain vacant lands in the vicinity of the demised premises called
the Battery, should never be appropriated by them or their successors to private
uses, held that this covenant did not operate upon lands subsequently added to
the battery by the corporation.

Injunction will issue to restrain the State or a municipal corporation from main-
taining a nuisance on their lands.

Injunction should not be issued unless the thing sought to be prohibited is in itself
a nuisance. If the thing to be enjoined is not in itself noxious, and the risk of
the anticipated injury is not imminent, the court may refuse to interfere until
the matter has been tried at law.

An immigrant depot is not a known nuisance in the law.

A stronger case must be made out where the ground of the injunction is anticipated
depreciation of the value of neighboring property, than where it is injury to the
health of the neighborhood.

Order to show cause why injunction should not be made
perpetual.

The commissioners of emigration of New York city leased
from the corporation the premises known as Castle Garden, to
be used as a depôt or station for the landing of emigrants. The
plaintiff on behalf of himself and others, land owners in the
neighborhood, obtained a temporary injunction against the
defendants. His complaint alleged that the contemplated use
of the premises was a violation on the part of the corporation
of their covenants in regard to the use of the Battery, con-
tained in the corporation deeds of neighboring lands under
which plaintiff claimed title. Further, that if the place were
put to the intended use, there was reason to believe that con-
tagious diseases would be generated and spread in the neigh-
borhood. And that the vicinity of a source of noxious and
disagreeable odor would depreciate the value of property.

These allegations were supported by affidavits on the part
of the plaintiff, and denied and qualified by a large number
of affidavits on the part of the commissioners.

*Messrs. Cutting and Perry,* for Plaintiff.

*The Attorney General and Mr. Devlin,* for the Commissioners of Emigration.

*Mr. Anderson,* for Henry R. Concklin.

*Mr. R. J. Dillon,* for the Mayor, &c., of New York.

HOFFMAN, J.—The case is to be considered in two aspects: First, in relation to particular statutes and conveyances, under which the plaintiff insists that he and those similarly situated with him, possess an absolute right, as owners of property, to have the intended use of Castle Garden prohibited. Second, in relation to the general law governing the court in interfering with parties whose acts amount to nuisances, or tend to such consequences, endangering property, health or comfort, as are equivalent to nuisances.

I. As to the particular rights of the plaintiffs as owners of property in the vicinity :—

1. The land upon which Castle Garden stands, as well as the Battery, as it was at any period defined, did not pass to the corporation of New York under the Montgomery charter by the grant of the four hundred feet into the river. The lines of that grant expressly exclude these premises. There was also a reservation of Fort George, "and the ground, full boundaries, and extent thereof, or thereto belonging."

2. The act of the 16th of March, 1790, in the second section, gave to the corporation all the lands belonging to the people of the State, within the limits described, as well as all the lands within such limits claimed by the corporation, except the lands reserved in the first section. The exception was the ground fronting the Bowling Green, and running to the rear of the lots fronting on Pearl-street, which it is here sufficient to indicate as the government house grounds. The recital shows that the intention was to convey Fort George, and the battery adjacent thereto. The corporation was to hold the premises "for the purpose of erecting public buildings and works of defence thereon, but without any power to dispose of the same for any other use or purpose whatever, and without any power of selling any part thereof."

In 1791, a map was made by J. Goerck, city surveyor, which shows the line of the Battery as it then existed, and as

it indeed continued until after 1821. It will be noticed that its general course was nearly straight, with the exception of a bastion near the northerly end, which projected irregularly to the westward of the line. It will also be noticed that the whole of Castle Garden, and of the bridge leading to it, are outside, or to the westward of this line. This is shown upon the same map, in connection with the outline of a survey made by Bridges, surveyor in 1807, and traced upon it.

3. The grant by the corporation to the government of the United States, of the 17th of Nov., 1807, comprises two parcels of ground :—First, an oblong, described by metes and bounds of 310 feet, and 300 on its westerly and easterly sides, and 200 feet and 125 feet on its northerly and southerly sides. The map of Goerck, with the additions, exhibits this parcel distinctly.

A careful examination of the map shows that a portion of this oblong was outside, that is, to the westward of the limits of the grant in the statute of 1791. It was beyond the bastion. But another portion of such oblong was within the statutory grant, for it comprised the bastion, as it is shown on the map of Goerck. Although the lines are not run particularly, there can be no doubt that the bastion passed under the statute. The first portion, then, of this transfer to the United States comprised one parcel of land clearly belonging to the corporation, and another parcel, the title to which is not clear. The dimensions of the whole parcel may be roughly stated at 49,000 superficial feet ; the parcel the title to which is not traced, at about 30,000.

But the next clause of the conveyance of 1807 grants all the right, title and interest of the corporation " to all that water lot, vacant ground, and soil under water, to be made land, and gained out of the Hudson river, of the breadth of three hundred feet, lying on a course south sixty-four degrees west," adjoining the other parcel of ground. The length into the river is left indefinite.

The habendum of this conveyance is that the premises are to be held for the uses and purposes described. These purposes are expressed in the reservation, viz : " For constructing and erecting of fortifications for the defence of the port and harbor of New York." The condition expressed in the conveyance is, that if at any time hereafter, the premises should

cease to be used for the purposes of fortifications, or for any other purposes in which the public may be immediately interested, then the premises should revert to and re-invested in the mayor, aldermen, &c., and they should and might enter upon the same as of their former estate.

4. The attention of the counsel was called to the statement in the treatise upon the estate of the corporation of New York, that commissioners of the State had ceded the land under water to the United States, and some searches were made to trace this cession, but ineffectually.

It was observed that as the corporation did not appear to have a particle of title to the land under water, secondly described in their conveyance, it was not to be imagined, that the United States would have been content with that mere quit claim of an assumed interest. The following statutes, however, explain the history of the title very satisfactorily:—

By an act of the 20th of March, 1807, the governor, lieutenant-governor, chancellor and others, were appointed commissioners to declare the assent of the legislature to the cession of lands on Staten and Long Island to the jurisdiction of the United States, for purposes of defence. (*Sess. laws*, 1807, *ch.* 51).

By an act of the 18th of March, 1808, the commissioners appointed under the former act had their powers extended to lands in the city and county of New York, and to lands covered with water in said city and county of New York, provided that the cessions to be made of such lands should be necessary for the defence and safety of the city of New York. (*Sess. laws*, 1808, *ch.* 51). By the 4th section of this act, such commissioners were empowered to grant to the United States, for the purpose of providing for the defence of the city, the use of any of the lands and waters belonging to the people of the State, in the said city and county of New York, which lands shall be granted on the express condition of their reverting to the people of this State in case they are not applied to the purposes aforesaid. (See also an act for the extending of Bridge-street to the Battery, passed April 8, 1808, chap. 168).

It appears from the Revised Statutes of 1830, (Vol. 1, p. 68), that a deed of cession was made by these commissioners, dated the 6th of July, 1808, of the parcel of ground at the foot of Hubert-street, and of a portion of the premises now in question.

The deed of cession is stated to be in the Secretary of State's office.

The boundaries of this cession are very particular. The point of beginning is the same as in the re-lease from the corporation. The easterly line is the same; so is the course of the northerly line; but the depth into the river is 500 instead of 200 feet; the length on the westerly side is the same, and on the southerly the depth is 425 feet, instead of 125.

We thus see, that from the same base line at the eastward, the line of the cession by the State ran 500 feet into the river—that of the corporation 200 feet. The latter line ran to a point upon the bridge, about one-third from its commencement.

The cession by the State contained a provision that the United States were to retain the use and jurisdiction so long as the two tracts should be respectively used and applied to the purposes of defence and safety to the city and port of New York, and no longer.

An obscurity exists as to the ground of the claim of the corporation to run 200 feet into the river. The State did not concur in it.

But supposing the claim well founded, we have then the United States holding the property under a cession of the use and jurisdiction, not the fee, from the State, for the westwardly three hundred feet, and under a transfer from the city for the residue, with a clause of reverter upon its disuse.

5. In this situation the act of the 27th of March, 1821, was passed. The corporation was authorized to extend that part of the city usually called the Battery into the river six hundred feet, and all the title of the people of the State, in and to the land, and land under water, in front of and adjoining to the said Battery for that distance, was vested in the mayor and commonalty, "to remain for the purpose of extending such Battery for a public walk, and for erecting public buildings and works of defence thereon; but without any power to dispose of the same for any other use or purpose whatsoever, and without any power of selling it, or any part of it." Under this act, the reversionary right of the State to the land under water on which the castle stands, and to most of that over which the bridge ran, thus passed to the corporation upon the tenure expressed.

6. We thus arrive at the consideration of the act of congress, of March 30, 1822. The President of the United States was authorized to cause the works to be dismantled and disposed of, and to reconvey to the corporation the tract of land granted by them. This operated upon the parcel first described in the conveyance from the corporation, and restored that body to the rights it possessed in 1807. The express condition of the cession by the State would have reinvested the people with their original right and title but for the act of 1821, before noticed. The effect of that act of 1821, was to substitute the corporation for the State.

But the corporation purchased the materials of Castle Clinton from the United States, and possession of the whole of the premises was delivered to it by General Scott, on behalf of the government, about the 16th of June, 1823. (See resolution of that date). The city has continued in possession, used, and leased it, with the occupation of the bridge, from that time to the present, for its own benefit and profit.

7. The operation of the act of May 25, 1812, and that of April 13, 1813, with the sale in 1815, by the corporation, of the government house grounds, and the covenants in their deeds to Jon. Hone and others, is next to be examined. The plaintiff claims under one of these deeds. The covenant is "that the vacant grounds belonging to the parties of the first part, in the vicinity of the premises hereby granted, commonly called the Battery and Bowling Green, shall never be appropriated by the parties of the first part or their successors to private uses." This covenant extended to the Battery as it then existed, and no further. Goerck's map of 1791 defined the limits, pursuing the boundaries of the act of 1790. The covenant did not cover an inch of the ground now in question. The Battery, as then defined, was much to the eastward of that ground. Castle Clinton—all the premises now in question—were in the possession of the United States, and might have been held by them in absolute ownership forever. I am clearly of opinion that the covenant cannot be extended to any land beyond the known limits of the Battery in 1815.

8. The lease to Allen for the premises in question, dated the 23d of March, 1854, comprises a parcel of ground described "as all that certain piece or parcel of land situate in the first

ward of the city of New York, on the North or Hudson river, near the west end of the Battery, and on which the building erected for a fortification, and heretofore known as Castle Clinton, and now as Castle Garden, stands; but without any right of way by carts, carriages or other vehicles upon or across the Battery, or any part thereof, without the special leave of the mayor in writing. The lessee to have no exclusive right to occupy or use the bridge leading from the said Battery to the Garden, except the right of the same for foot passengers, and to have no right of wharfage on either side thereof."

The premises, therefore, are Castle Garden proper, and the right of way over the bridge.

There is a covenant in the usual form, not to assign or sublet the premises without the assent of the corporation. -

An assent was given by the comptroller, on behalf of the common council, on the 27th of March, 1855, sanctioning the assignment by Allen to Conklin. The duty and power to give such assent is conferred by the ordinance of 1844, (sec. 4 of title 4). The comptroller has refused his consent to the assignment by Conklin to the commissioners of emigration, made by him on the 5th of May, 1855.

It is insisted that the want of such assent renders that assignment wholly void. It is replied that by consenting to one assignment the covenant is discharged. Dumpor's case, (4 *Coke*, 119, *Smith's leading cases*, 15). Brummel *v.* Macpherson, (14 *Vesey*, 173); and Dakin *v.* Williams, (17 *Wend.* 447) have been cited. Whether, as the last case partly intimates, there is not a distinction between conditions and covenants in this particular I need not consider. I am of opinion that it is for the corporation alone to take advantage, by re-entry or otherwise, of any breach of the covenant. No one else can do so. And one among several reasons is, that the reception of rent after the breach would prevent a forfeiture. (Goodright *v.* Davids, *Cowper*, 803). It is stated in the affidavit of the commissioners that they have paid rent since they took possession.

I conclude this branch of the case with the following propositions, which appear to me to be established by the preceding review of the statutes and documents upon the subject.

1. That the plaintiff and other owners of the lots purchased

in 1815 have no right, by virtue of the covenants in the deeds from the corporation, or otherwise, as owners of such lots, to interfere with any use which the corporation may make or permit, of the premises contained in the lease to Allen, and in question in this case.

2. That the corporation of the city of New York are entitled to the building called Castle Garden, and the materials of the bridge, by virtue of their purchase from the United States, in 1823 ; and are entitled to, and hold, the fee of the soil under such building and bridge, by virtue of the act of 1821.

3. That the United States did not acquire the fee of these premises by the cession from the State in 1808, but only the use of and jurisdiction over the same ; that this fee, subject to such right in the United States, passed to the corporation by the act of 1821 ; that the act of congress and surrender of possession discharged and extinguished this right of the United States, and inured to the benefit of the corporation as grantee of the State ; and thus the corporation hold the property under the act of 1821, and according to the conditions, and upon the terms, prescribed by such act.

4. That apart from the question of nuisance, no one but the people of the State has any right to interfere with any use whatever which the corporation may think proper to make of these premises ; that persons in the position of this plaintiff may indeed unite in a complaint, or act as relators with the attorney general, to prevent a perversion of the property ; but the people, through that officer, must be parties to the action. It is needless to refer to any other case than that of the Broadway Railroad, (11 *Legal Obs.*, 359), to support this proposition. The condition attached to the grant by the State, and the purposes for which the land was bestowed, were all of a public nature—concerning all the inhabitants of the city at large.

5. That the want of the assent of the comptroller to the assignment by Conklin, if legally necessary, and not dispensed with by reception of rent, is an objection only to be taken advantage of by the corporation itself.

II. I proceed to the consideration of the second branch of the cause.

1st. There can be no question that if the occupation of Cas-

tle Garden as an emigrant depôt would amount to a nuisance, neither the corporation of New York, nor the State, nor the two united, could so employ it. An injunction would then be granted. In addition to the cases cited, I refer to the Attorney General *v.* Johnstone, (2 *Wilson's Rep.*, 95, 2 *Starkie*, 51), and to the Attorney General *v.* Parmentier, (*vol.* 6, *Exchq. Rep.*, *Phil. edition*) : "The crown has not a right either itself to use the title to the soil between high and low water as a nuisance, or to place upon that soil what will be a nuisance to the crown's subjects. If the crown has not such a right it could not transfer it to the city of London." An injunction was retained to await the result of an indictment which was pending.

2d. But few points are better settled than this :—That a Court of Chancery will not interfere by injunction unless the thing sought to be prohibited is in itself a nuisance, and irreparable mischief will ensue unless the prohibition is granted before a trial at law. If the thing to be enjoined is not noxious of itself, but something which may, according to circumstances, prove to be so, the court will refuse to interfere until the matter has been tried at law. But if the magnitude of the injury to be dreaded is great, and the risk so imminent that no prudent man could think of incurring it, the court will not refuse to interfere on the ground that there is a possibility that the anticipated injury from the noxious erection may not happen.

These are the general rules laid down by Lord Brougham, (*Cooper's R. Temp. Brougham*, 343), adopted by Chancellor Walworth, (6 *Paige*, 563), and sustained and applied in the following cases:—Rowe *v.* The Granite Bridge Company, (21 *Pick.* 344), Vaughan *v.* Law, (1 *Humphrey*, 123), Kirkman *v.* Houck, (11 *Humphrey*, 406), City of Georgetown *v.* Alexandria Canal Company, (12 *Peters*, 92), White *v.* Cohen, (19 *Eng. L. and Eq. Rep.*, 149). See also the subject examined in The Attorney General *v.* The Sheffield Gas Company, (3 *De Gex, McNaughtan and Gordon*, 316).

While the general rule is thus stated, it will be noticed, that in very many of the authorities the effect of the intended erection was an expected injury to property merely.

The cases which relate to an expected injury to health and

comfort require to be more particularly referred to, as more applicable to the present question.

The principal of such cases are the following:—Anon, (3 *Atk.*, 750), Catlin *v.* Valentine, (9 *Paige*, 576), The Burnt Island Whale Fishing Company *v.* Trotter, (5 *Wilson & Shaw*, 649), Swinton *v.* Pedrie, (15 *Shaw & Dunlap*, 775, *McLean & Robinson's Parl. Rep.*, 1018), The Mayor of London *v.* Bolt, (5 *Vesey*, 129), The Attorney General *v.* Cleaver, (18 *Vesey*, 211), Attorney General and others *v.* Blount, (4 *Hawks*, 384).

We find most of these cases to be those of slaughtering-houses. Now such an erection is indictable as a nuisance at common law, (Rex *v.* Cross, 2 *Carr & Payne*, 483, and see Rex *v.* Watts, *Ibid* 486). The Scottish cases, Catlin *v.* Valentine, and several others in our courts, are open to the comment that *prima facie* the trade or building to be inhibited was indictable as a nuisance, and the court would not permit an experiment to be made to ascertain whether untried, though apparently efficient means, might not remove or diminish the evil.

The Scottish case of Swinton *v.* Pedie deserves particular notice. The bill of suspension and interdict was to restrain the erection of a range of shambles and slaughter houses, which, it was alleged, would prove a nuisance to the property of the parties, and would pollute a mill head which passed the neighborhood. The interdict granted by the lord ordinary, to whom it was presented, was absolute; restraining the erection of the buildings as well as the intended use of them as shambles. This was *ex parte*. On a hearing he recalled the interdict so far as it prohibited the erection of the buildings, but no further.

When the record was closed, (proofs being taken), another lord ordinary made the interdict permanent as it was modified.

On appeal from this decision, the plans by which the party expected to remedy the evil were ordered to be submitted. This was done at length, and, upon considering them, the Scottish Appeal Court adhered to the interdict.

Then in the house of lords it was recognized that the effect of the interdicts, as they stood, allowed the party to go on with the building. The result was, that the interdict was sustained, but with a qualification or declaration which would

enable the party to apply to the court thereafter for an opportunity to try the experiment whether the means he had devised were effectual to remove the nuisance. The court was not by the decree to be prevented from recalling the interdict if so advised.

The foundation of the decision throughout was, that a slaughter house in a city was, by the law of Scotland as of England, a common nuisance.

In Rex. *v.* Ward, (1 *Burrows*, 333), the indictment was for erecting and continuing works for making acid spirit of sulphur, oil of vitriol, and oil of aquafortis; that in the process was sent forth abundance of noisome, offensive and stinking smoke, whereby the air was impregnated with noisome and offensive smells, to the common nuisance of all the king's subjects residing, &c. From the judge's report it appeared that the smell was not only intolerable and offensive, but also noxious and hurtful, and made many persons sick. A conviction was sustained. The word noisome was held synonymous with noxious, and that included insalubrity and unwholesomeness.

I think, then, that the rule declared by Lord Hardwicke in the case cited from 3 *Atkyns* is to this day the general rule of the court upon this subject. Bills to restrain alleged nuisances must be for such as are known nuisances in the law. Unless they are such, the court will not interfere without a verdict, except in very marked and imperative cases of imminent and irretrievable danger. Otherwise the parties will be left to indictment, or abatement; or occasionally an issue will be directed.

It is impossible to say that the law has pronounced an emigrant depôt in a city to be a public nuisance. Its character must be established by the nature of the diseases of its inmates—their frequency and extent—the number of persons received—the peril to health flowing from their presence—the location of the edifice as to a large or scanty population in its vicinity—the precautions which may be used, and may be depended upon; and many other circumstances peculiar to each individual case.

3d. It becomes therefore necessary for me to examine the particular circumstances appearing upon the affidavits and documents presented.

The State has considered the regulation of emigration into its limits as of such importance as to call for the appointment of a particular board to superintend it. The act of May, 1847, (chap. 195), created the commissioners of emigration such a board, and provided a fund by appropriating the tax of $1 50 for every emigrant for whom a bond was not given, to meet the expenses incurred for the support of the poor among them. In 1848 their authority was enlarged by the legislature in the act of April 11 of that year, and again by the act of April 13, 1850.

It is plain that the prominent object of the legislature in such an organization was to relieve the cities from the burthen of supporting the multitudes of the indigent and sick among the emigrants; to afford them means of support or restoration to health, until the opportunity of sustaining themselves was offered; of sheltering the unwary from the infamous frauds which were constantly practised upon them; and of guarding against the propagation of dangerous diseases with which they might be afflicted when they reached these shores.

Among other provisions for the accomplishing these, or some of these objects, the commissioners were authorized by the first section of the act of 1848 to lease or purchase suitable docks or piers in the city of New York, and to erect necessary enclosures thereon for the exclusive use of landing emigrant alien passengers; but no docks or piers could be purchased or leased without the approval or consent of the common council. A license was to be given on certain conditions, to proprietors of lighters or steamboats, to receive passengers from the vessels and land them on the selected piers, and a penalty was imposed for landing them upon any other piers or wharfs.

The act of April 13, 1855, directed the commissioners to designate some one place in the city for the landing of the passengers; and the seventh section provided that they shall have authority to purchase, lease, and occupy such wharves, piers, and other accommodations in the city of New York as may be necessary for the accommodation of emigrant passengers for the purposes of landing them. The eighth section places the authority in the health officer, to give notice to masters and owners to land the passengers at the pier or places thus designated.

The principal difference between the powers thus conferred, and those granted in the act of 1848, is that the consent of the corporation is not now made necessary to a purchase.

These provisions clearly indicate the sense of the legislature and of the commissioners of emigration, on whose application they were obtained, that the selection of particular places for the purpose of landing emigrants was of importance to carry out the objects in view.

I have carefully examined the affidavits now before me, and I consider that they establish, beyond any reasonable doubts, these points :—

1. That the selection of Castle Garden enables the commissioners more effectually to guard the emigrants from frauds and imposition. That it is of great advantage in facilitating their dispersion throughout the country; and of giving them the benefit of the counsel and aid of the several societies specially formed to watch over their comfort.

2. That the employment of Castle Garden for the purpose of a re-examination is of manifest advantage, in its tendency to secure the health and comfort of the emigrants themselves. The judgment and experience of the commissioners, confirmed by the affidavit of Dr. Harris, formerly deputy health officer, Dr. Osborn, and other physicians, of Captain Crabtree, and of Cyrus Curtis, formerly a commissioner of emigration, establish this.

3. The bringing together all the emigrants whose diseases have escaped detection at Quarantine, into one place, such as the premises in question, is decidedly more likely to avert the propagation of diseases in the city at large than the present system. The effects of landing the passengers at different points—of immediately crowding them into filthy boarding houses—are stated in the affidavits of several of the experienced physicians and others, and bear every appearance of good sense and truth.

4. The question of the deterioration of the value of property depends chiefly on the settlement of the question next discussed, as to the effect of the proposed use of the Garden upon the health of the neighboring inhabitants. As far as any distinction exists, it is sufficient to say, that a stronger case must be made for an injunction than in cases of threatened injuries

to health. When a nuisance is established and abated by the verdict of a jury, the injury to property will be removed.

5. In relation to the decision in Brower *v.* The Mayor, &c., (3 *Barb. S. C. Rep.*, 254), I may say that a case was there made by the plaintiff, and not successfully repelled by the defendants, widely different from the present.

6. The remaining and leading question is as to the extent and imminence of the danger from contagious or infectious diseases, to the inhabitants in the immediate vicinity, represented by the plaintiff.

The distance of the Garden from the nearest habitation is about five hundred feet: The intermediate space is open ground, with a free ventilation. I must confide in the statements of the commissioners, that they mean to prevent the emigrants from intruding on the Battery grounds, and I see no difficulty in their accomplishing this purpose.

Disregarding the long list of deponents on each side, whose want of information upon this subject robs their opinion of weight, I have given my principal attention to the affidavits of the medical gentlemen. If the rustic rule of decision, *numero non pondere,* was applied, I find an overwhelming number on the part of the defendants. It is of course beyond my power to estimate the relative weight of character and qualification. But several of the physicians on the part of the defendants are now, or have been, in official situations which entitle their opinions to influence, independent of comparative professional eminence. Among these are Dr. Harris, formerly deputy health officer, whose affidavit merits particular notice; Dr. Sterling, physician at the Marine Hospital from 1848 to 1853, and examining physician of the commissioners since that time; Dr. Rockwell, health officer for four years, and now resident physician of city and agent of the board of health; Dr. Miller, the present health commissioner, and formerly member of the common council and on the committee of public health; Dr. Fay, deputy health officer for three years prior to the summer of 1854; Dr. Cox, visiting physician to the hospital of the commissioners; Dr. Thompson, health officer of the port of New York; Dr. Roth, in the employ of the commissioners at Quarantine; Dr. Martindale,

deputy health officer of the port; and Dr. Vaché, physician in chief of the Marine Hospital, and for five years resident physician of the city.

The opinions of so large a number of responsible officers and experienced physicians are in my judgment decisive. I attribute more than mere personal importance to the oaths of those who have been set apart by the public to watch over the health of the city; whose experience and constant familiarity with the habits and diseases of emigrants mark them as best qualified to speak with authority; and whose prejudiced or even hasty judgment involves, not merely the impeachment of their fairness and intelligence, but the violation of a solemn duty consigned to them by the public. All these, with entire unanimity, state that the apprehensions of the spread of contagion from such a use of Castle Garden as is proposed, are groundless.

7. Another consideration is, that the common council of the city, as conservators of the public health, may abate every nuisance; and, if experience proves that the evils and dangers anticipated by the plaintiffs are in any degree realized, they may be immediately removed. The powers of our corporation are as extensive as those of the municipal authorities of Boston or of Albany; and such is the rule prevailing there. (Baker v. Boston, 12 *Pick.*, 184; Van Wormer v. The Mayor of Albany, 15 *Wendell*, 262). By the act of 1850, (*ch.* 275), the mayor and common council are constituted the board of health; and by section 2 of article 1, title 3, they have full authority to abate all nuisances within the city.

I have given to this motion the care and study its importance and interest demand, and the result is a conviction that to arrest the plan of the commissioners, full as it is of so many undeniable benefits, upon the evidence now before me, would be a rash and unwarrantable exercise of power, salutary only when wielded with caution, but a formidable and mischievous engine of wrong when exerted except upon the mandate of imperious necessity.

The motion for the injunction must be denied, and the temporary order discharged, without costs to either party.

NOTE. This decision was affirmed on appeal to the general term.